1

2

3

4

5

6

7        IN THE UNITED STATES DISTRICT COURT FOR THE

8            EASTERN DISTRICT OF CALIFORNIA

9

| | | |
|---|---|---|
| 10 | JOE PARKS, ) | 1:09-CV-1314  AWI GSA |
| 11 | Plaintiff, ) | |
| | v. ) | |
| 12 | ) | ORDER ON DEFENDANTS' |
| | BOARD OF TRUSTEES OF THE ) | MOTION FOR SUMMARY |
| 13 | CALIFORNIA STATE UNIVERSITY, ) | JUDGMENT |
| | PAUL BEARE, JOHN WELTY, ) | |
| 14 | JANETTE REDD-WILLIAMS, JANICE ) | |
| | PARTEN, JERI ECHEVERRIA, and ) | (Doc. No. 34) |
| 15 | DOES 1-50, ) | |
| 16 | ) | |
| | Defendants. ) | |
| 17 | _____ ) | |

18

19        This is a civil rights case brought by pro se Plaintiff Dr. Joseph Parks ("Parks") against

20    his employer Defendant Board of Trustees of the California State University ("Trustees") and

21    various administrative personnel of the Trustees – Paul Beare ("Beare"), John Welty ("Welty"),

22    Janette Redd-Williams ("Redd-Williams"), and Janice Parten ("Parten").[1]  Parks is a professor of

23    education at California State University – Fresno ("CSUF").  The operative complaint is the

24    Second Amended Complaint ("SAC").  Parks alleges violations of 42 U.S.C. § 2000e-2 ("Title

25    VII") and California Government Code § 12900 et. seq. (the Fair Employment and Housing Act

26    ("FEHA")).  All  Defendants now move for summary judgment on all claims alleged against

27    them.  For the reasons that follow, the motion will be granted.

28    _____
          [1]Defendant Jeri Echeveria was dismissed from this case pursuant to Court order on April 20, 2010.

**FACTUAL BACKGROUND**[2]

Parks is a 67 year old African-American professor of education at CSUF.  See DUMF 1; PRDUMF 1.  Parks was hired in 1998, and teaches at the Kremen School of Education at CSUF, where his duties include teaching courses, supervising masters level students in completing their final projects, and supervising student teachers who work in local schools.  See Parks Depo. 9:24-11:8.

During the Fall 2007 Semester, students in Parks's CI 159 course lodged written and oral complaints with CSUF against Parks.  DUMF 3.  The students alleged that Parks had subjected them to harassment and discrimination based on race, gender, and religion/marital status.  See id. Initially, students Chitwood and Cabrera complained to Associate Dean Torgerson and Dr. Marshall (who is the Chair of the Department of Education and Curriculum).  See id.  Although the initial oral complaints were received in September 2007, CSUF did not immediately commence its investigation.  See DUMF 4.  Chitwood was transferred after her oral complaints, but made a formal written complaint on January 2, 2008.  See Defendants' Ex. B.  Chitwood's formal complaint explained that, although she had transferred classes, she learned that Parks had read to his class a complaining e-mail that Chitwood's husband had sent to Dean Torgerson, and that Parks had left identifying information in the e-mail.  See id.  Cabrera made her formal written complaint in November 2007, but expressed fear that Parks would retaliate against her, including through grades in the class.  See id.  Because of the fear expressed, CSUF did not begin investigation of Parks immediately.  See DUMF 4.  When the January 2008 formal complaint was received, CSUF commenced its investigation.  See id.[3]  Meanwhile, numerous other complaints from students in Parks's CI 159, CI 250 (Fall 2007), and CI 159 (Spring 2008)

---

[2] "DUMF" refers to "Defendants' Undisputed Material Facts," and which appear in the docket under entry 34-1.  "PRDUMF" refers to "Plaintiff's Response to Defendants' Undisputed Material Facts," and which appear in the docket under entry 37.

[3] Plaintiff disputes DUMF 4 by arguing in part that Defendants solicited complaints about him, and that the complaints received were from a fraction of the 150 students he taught during the Fall 2007 and Spring 2008 semesters.  However, these arguments do not dispute the relevant substance of DUMF 4.  Further, no evidence is cited in support of the argument.  A bare assertion in a legal memorandum that is unsupported by factual data or evidence will create no factual dispute.  Exeter Bancorporation, Inc. v. Kemper Secs. Group, Inc., 58 F.3d 1306, 1312 n.5 (8th Cir. 1995); Angel v. Seattle-First Nat'l Bank, 653 F.2d 1293, 1299 (9th Cir. 1982); British Airways Bd. v. Boeing Co., 585 F.2d 946, 951-52 (9th Cir. 1978).

1    courses were filed with CSUF officials, which broadened and extended the necessary scope of

2    the investigation as well as the time required to conduct the investigation.  See id.

3         When CSUF learned in the Fall 2008 semester that Parks had retaliated against some

4    student complainants in his classroom, CSUF President Welty decided to place Parks on

5    administrative suspension with full pay pending the outcome of the investigation.  See DUMF 5.

6    Parks was suspended in order to prevent further retaliation.  See id.  Pursuant to Article 17 of the

7    Collective Bargaining Agreement between CSUF and its faculty, Parks was placed on a 30-day

8    administrative suspension with full pay so that the investigation could be conducted without fear

9    that Parks would further retaliate against students.  See DUMF 6.  On February 22, 2008, Parks

10   was served with notice of the suspension and of the reasons for the suspension, including the

11   allegation of retaliation against students.  See id.

12        Because of the number of complaints and the scope of the investigation, the investigation

13   could not be completed in 30 days.  DUMF 7.[4]  Consequently, Parks's suspension with pay was

14   extended to April 21, 2008, by agreement between Parks and CSUF.  See id.  The agreement to

15   extend the suspension was negotiated between March 27 and April 1, 2008, and was negotiated

16   by Redd-Williams and Parks's union representative Brian McNally.  See id.  On April 3, 2008,

17   Parks was notified that his suspension was extended to April 21, 2008.  See id.  However, once

18   the investigation was completed and the report issued, CSUF decided to extend Parks' absence

19   with pay through the end of the semester to prevent unnecessary disruption of the students'

20   academic process that would have resulted from another change of instructor so late in the

21   semester.  See id.  The suspension with pay is not discipline under CSUF's progressive discipline

22   policy or State Personnel Board rules.  Id.

23        In Fall 2007/Spring 2008, Parten was Director of Human Resources as well as the Equal

24   Employment Opportunity designee at CSUF.  DUMF 8.  As the EEO designee, Parten initiated

---

[4] Plaintiff disputes this DUMF by stating that: he disagrees that the investigation could not have been completed in 30 days, he requested that other students be interviewed, he requested copies of student complaints but was refused, and interviews did not start until two weeks into the suspension.  However, most of these arguments do not dispute the substance of DUMF 7.  Moreover, with the exception of when the interviews started, there is no evidence cited in support of Plaintiff's assertions.  Cf. Exeter, 58 F.3d at 1312 n.5; Angel, 653 F.2d at 1299; British Airways, 585 F.2d at 951-52 .  DUMF 7 is undisputed.

1  the investigation review, which included herself, Associate Dean Dr. Jose Diaz, and Assistant

2  Vice President Dr. Carolyn Coon.  See id.  This group conducted an investigation into the

3  allegations noted in the numerous student complaints that had been forwarded to other CSUF

4  officials.  See id.[5]

5          In June 2008, Parten's group completed the investigation, and issued a confidential report

6  to Welty, Redd-Williams, and Provost Echeverria.  See DUMF 9.  Appendix A of the report is a

7  chart that identifies the various student complainants as well as some students who supported

8  Parks.  See id.  The report indicates that 28 students were either interviewed and/or provided

9  statements.  See PRDUMF 11; Plaintiff's Ex. 2.  Of those 28 students, 12 were supportive of

10 Parks.  See id.  The chart also lists information regarding the timing of the complaints, which

11 CSUF officials received the complaints, the form of the complaint (written or oral), whether a

12 student was interviewed, the identity of the interviewers, and the time and date of each interview.

13 See id.  The report also contains findings that Parks made offensive comments and statements in

14 class related to race, gender, national origin, ancestry, and religion including:  (1) repeatedly

15 referring to white students as "white boy" or "white girl" or "whitey" rather than using actual

16 names; (2) stating that "all white students look alike;" (3) stating that "black people don't swim

17 or play white sports;" (4) that "whites are right-wing fanatics;" (5) referring to white students as

18 "squirrels" and stating that he did not like white men but did like "pretty white girls;" (6) making

19 repeated references to "you Mexicans" and stating that all Mexicans look alike; (7) stating that

20 California education has changed because "Mexicans learned how to swim;" and (8) reporting to

21 the class that "three Mexicans reported him to the dean."  DUMF 10.[6]  The report also found that

22

23          [5]Plaintiff disputes DUMF 8 by arguing that, based on the lack of available information, he believes that
   Parten has never used a three person panel to investigate complaints against white professors.  However, this does
24 not dispute the substance of the DUMF, and there is no evidence cited in support of the assertion.  The argument
   does not create a genuine factual dispute.  Exeter, 58 F.3d at 1312 n.5; Angel, 653 F.2d at 1299; British Airways,
25 585 F.2d at 951-52.  DUMF 8 is undisputed.

26          [6]Parks disputes this DUMF by arguing that the statements listed are either lies or were taken out of context.
   However, there is no evidence cited in support of this bare assertion.  Thus, no genuine dispute of fact is created.
27 See Exeter, 58 F.3d at 1312 n.5; Angel, 653 F.2d at 1299; British Airways, 585 F.2d at 951-52.  Parks also states
   that the statements came from a letter solicited by Parten.  While there is a letter that contains the comments listed,
28 there is no evidence that the letter was solicited.  Further, there is no indication that the identified letter is the only
   source of the identified statements.  DUMF 10 is undisputed.  See id.

Parks directed all married students to stand at the front of the class and said that he hoped all the remaining students who were seated were virgins, because otherwise they were immoral.  See Defendants' Ex. D at p. 17.  As to retaliation against students, the report contains findings that Parks told students: (1) there was no point in complaining about him to the dean because he was tenured; (2) three Mexicans complained about him to an administrator and that he would resign because of the Mexicans; (3) that other students had complained to the Department Chair about him and were "crying" and that he would "figure out which student complained once he saw the roster."  DUMF 10.  The report also contains a finding that Parks ridiculed a complaint filed by the husband of a student who had withdrawn from Parks' course due to his behavior.  Id.  Parks displayed the e-mail to the class, including information that identified the student.  Id.  At least three students were able to identify the student complainant from the e-mail.  Id.  Parks indicated to the class that he would figure out who the complainant was.  Id.  These and other factual findings are stated in the Confidential Report in the Key Factual Findings section.  Id.  The report's findings sustain, in substantial part, the allegations of harassment and discrimination lodged by students against Parks.  Id.

On July 18, 2008, CSUF notified Parks regarding the findings and conclusions of the investigation.  DUMF 11.[7]

On July 30, 2008, CSUF issued Parks a letter of reprimand pursuant to Article 18 of the Collective Bargaining Agreement between the faculty and CSUF.  See id.  The letter of reprimand contains findings of fact, and recommendations to Parks.  Id.  The letter is based solely upon the findings in the report and the evidence substantiating those findings.  Id.  The letter of reprimand is not discipline under CSUF's progressive discipline policy nor under State Personnel Board rules.  Id.

During the Fall 2008 semester, two female teacher candidates whom Parks supervised

---

[7]Plaintiff disputes this DUMF by arguing *inter alia* that 12 students in the report supported him, that Parten admitted that 3 of the 16 interviewed students were supportive, and thus the 126 page report is based on the comments of 13 students.  However, while the report indicates that 12 students were supportive, no evidence is cited in support of the assertions regarding Parten's comments, and Plaintiff has not shown that the students who were supportive of him actually refuted the complainants' accusations.  DUMF 11 is undisputed.  Cf. Exeter, 58 F.3d at 1312 n.5; Angel, 653 F.2d at 1299; British Airways, 585 F.2d at 951-52

1  lodged complaints against Parks with CSUF.  DUMF 12.  The two women met with Parks on

2  November 5, 2008, and alleged that Parks made race based comments in a conversation about

3  newly elected Barack Obama.  DUMF 12.  Specifically, the women alleged that Parks

4  commented on President Obama being the "black man in the office," and that they were going to

5  "make us whities work in the cotton fields," and that one of the women would be "an upstairs

6  chambermaid" while the other would be "the cook."  See id.  Because of her position as the

7  Associate Vice President of Academic Personnel, Redd-Williams investigated the allegations by

8  the two women.  See DUMF 13.  Redd-Williams eventually determined that Parks had not

9  violated any laws or CSUF policies in his discussions with the women.  See id.

10      However, during Redd-Williams' investigation, CSUF received other complaints about

11  Parks from administrators of area schools where Parks was supervising student teaching

12  candidates.  DUMF 14.[8]  The complaints alleged that Parks was not properly supervising student

13  teachers and was not properly communicating with the on-site master teachers regarding the

14  performance and progress of the student teachers.  Id.  Student-teacher evaluations of Parks as a

15  supervisor rated his performance as poor.  Id.  Parks was provided an opportunity to respond to

16  these new allegations.  See id.  Because these complaints were received during Redd-Williams'

17  investigation, her investigation was expanded to also look into the new complaints from the

18  administrators.  See id.

19      Redd-Williams completed her investigation and submitted a report to President Welty on

20  May 11, 2009.  DUMF 15.  As indicated above, the report absolved Parks of any race based

21  misconduct with respect to the alleged race-based comments.  See id.  However, the report

22  concluded that Parks failed to perform the normal and reasonable duties of his position as

23  instructor.  See id.

24      On May 12, 2009, CSUF notified Parks regarding the findings and conclusions of Redd-

25

26      [8]Parks disputes this DUMF by arguing that Redd-Williams and Beare solicited complaints from student
27  teachers, Master Teachers, and Principals.  Parks cites Exhibits 4 and 5.  However, Exhibits 4 and 5 does not state
   that they are in response to a solicitation by Redd-Williams and Beare.  Exhibit 5 is directed to "Mr. Marshal" and
   expresses appreciation for Marshal's willingness to remove Parks from supervising all student teachers at the
28  elementary school.  See Plaintiff's Ex. 5.  There is insufficient evidence that the complaints from school
   administrators were actively solicited.  DUMF 14 is undisputed.

1    Williams's investigation.  See id.  Also on May 12, 2009, CSUF issued Parks a letter of

2    reprimand pursuant to Article 18 of the Collective Bargaining Agreement.  See id.  The letter of

3    reprimand is signed by Beare, who is the Dean of the Kremen School of Education.  DUMF 16.

4    The letter of reprimand was issued solely upon the findings contained in the investigation report

5    as substantiated by the information gathered during the investigation.  Id.  The investigation

6    conducted by Redd-Williams and the letter of reprimand were not done to discriminate against

7    Parks on the basis of age or race, and was not done to retaliate against Parks for filing complaints

8    with the EEOC or the DFEH.  See id.

9         From 2007 through 2009, Dr. James Marshall served as Chair of the Department of

10   Curriculum and Instruction.  DUMF 17.  Marshall's duties included issuing job assignments to

11   professors within the Kremen School of Education.  Id.  At all times relevant to this action,

12   Marshall was responsible for assigning professors teaching and supervisory responsibilities.  Id.

13   At all times relevant to this action, Marshall assigned Parks the duty of supervising various

14   student teachers, and assigned other non-African-American professors the duty of supervising

15   various student teachers.  Id.  In every instance, Marshall made the student teacher supervisory

16   assignments with the sole intent to utilize CSUF's resources efficiently and for the best benefit of

17   the students.  Id.  Marshall did not assign Parks supervisory duties to discriminate against Parks

18   on the basis of age or race, or to retaliate against Parks for filing charges with the EEOC and

19   DFEH against CSUF.  Id.

20        Marshall did not solicit complaints against Parks to discriminate or retaliate against

21   Parks.  DUMF 18.  During the Fall 2007 and Spring 2008 semesters, several students volunteered

22   complaints against Parks that alleged discrimination and harassment of several varieties.  Id.  As

23   Chair of the Department of Curriculum and Instruction, Marshall had responsibilities regarding

24   CSUF's response to the complaints.  See DUMF 19.  Any contacts Marshall had with students

25   regarding allegations made against Parks were part of his duties to respond and make decisions in

26   the best interest of both the faculty and student body.  Id.

27        Defendants have never discriminated against Parks on the basis of his race or age.

28   DUMF 20.  Defendants have never harassed Parks on the basis of his race or age.  Id.

Defendants have never retaliated against Parks because of his filing charges with the DFEH or the EEOC, or because of any other protected activity Parks may have engaged in.  Id.

**LEGAL FRAMEWORK**

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying the portions of the declarations (if any), pleadings, and  discovery that demonstrate an absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it might affect the outcome of the suit under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings Assn, 322 F.3d 1039, 1046 (9th Cir. 2002).  A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  Anderson, 477 U.S. at 248; Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant.  Soremekun, 509 F.3d at 984.  Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim.  See James River Ins. Co. v. Schenk, P.C., 519 F.3d 917, 925 (9th Cir. 2008); Soremekun, 509 F.3d at 984; Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000).  If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion." Nissan Fire, 210 F.3d at 1102-03.  If the moving party meets its initial burden, the burden then shifts to

the opposing party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire, 210 F.3d at 1103.  The opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'"  Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting Fed. R. Civ. Pro. 56(e)).

The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Stegall v. Citadel Broad., Inc., 350 F.3d 1061, 1065 (9th Cir. 2003).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal. 2008); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine issue of material fact does not spring into being simply because a litigant claims that one exists or promises to produce admissible evidence at trial."  Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007); Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).  Further, a "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'"  Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006).  Additionally, the court has the discretion in appropriate circumstances to consider materials that are not properly brought to its attention, but the court is not required to examine the entire file for evidence establishing a genuine issue of material fact where the evidence is not set forth in the opposing papers with adequate references.  See Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).  If the nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled to summary judgment.  See Nissan Fire, 210 F.3d at 1103.

**DEFENDANTS' MOTION**

I.    First, Second, Third, & Fourth Causes of Action[9]

   *Defendant's Argument*

   The Trustees argue that they are entitled to summary judgment on the FEHA and Title VII claims against them.  Parks identifies several personnel actions by the Trustees against him that constituted discrimination:  he was assigned to supervise students, he was given a reduced class assignment, he was removed from teaching a master's level class, student complaints were received and he was investigated, there was delay in the issuance of the investigation report, his duties were limited, and he was reprimanded.  However, the undisputed facts show that there were legitimate, non-discriminatory reasons for the personnel actions at issue, and Parks has no evidence of pretext.

   Specifically, Parks was investigated in January 2008 in response to complaints by students.  The investigation took longer to complete than originally anticipated because additional complaints were received, which necessitated expanding the scope of the investigation.  Parks agreed to expand the suspension an additional 30 days.  The investigation concluded that Parks had made offensive comments in class related to gender, race, national origin, ancestry, and religion.  The report also concluded that Parks retaliated against a complaining student.  On July 30, 2008, a letter of reprimand was issued.  The sole basis for the reprimand was the investigation's report and the evidence that supported the report's findings.

   With respect to the letter of reprimand in May 2009, the letter was based on complaints received from area schools where Parks was supervising student teachers.  An investigation into those complaints found that Parks was not properly supervising student teachers and was not properly communicating with master teachers on the student teacher's progress.

   Also, from 2007 to 2009, Dr. Marshall was responsible for issuing job assignments to professors, including teaching and supervisory duties.  Marshall assigned other non-African-American professors the duty of supervising various students.  Marshall made the assignments with the sole intent of utilizing CSUF's resources efficiently.  Marshall had no intent to

---

[9]The first four causes of action are alleged against only the Trustees.

discriminate against Parks on the basis of age or race or in retaliation for filing charges with the EEOC or the DFEH.  Parks testified that he understood that supervising student teachers would be part of his job duties when he applied for employment in 1998.  See Parks Depo. 10:21-11:8.

Finally, with respect to removal of Parks from a graduate class in the Fall of 2007, the only suspension suffered occurred in Spring 2008, and Parks's contention is simply a reformulation of the argument that the 2008 suspension during Parten's investigation was discriminatory.[10]  Parks confirmed that the removal stemmed from complaints about statements regarding religious beliefs and marital status in his deposition.  Specifically, when Parks directed the married students to stand and he made a comment about virgins.  The removal was for legitimate non-discriminatory purposes.

*Plaintiff's Opposition*[11]

Parks contends that he has sufficient evidence to show that his 60 day suspension was baseless and unworthy of credence.  The written documents show that many of the students interviewed by Parten lied about certain events that did not take place.  For example, one student filed two complaints, but only the second complaint mentions an incident regarding a "terroristic threat."  Further, citing to his sur-reply Exhibit 4, Parks argues that eight of the supportive e-mails received during the 2008 investigation contradict the complainants.  Parks also argues that only interviewing 16 students out of a possible 150 put him in a no win situation, and that Defendants' waited until April 21, 2008, to interview him, even though the last student interview was March 11, 2008.[12]  Parks contends that the timing of the interviews precluded interviewing other students.  Parks argues that Defendants have not carried their burden of proving that the false statements made about him were without malice.  Parks contends that he was removed from

---

[10] The bulk of Defendants' arguments with respect to the removal of Parks from the Fall 2007 graduate class were made in the reply brief.  Parks filed a sur-reply that the Court will consider.  In light of the sur-reply, the Court is satisfied that there has been an adequate opportunity for briefing on the issue of the Fall 2007 graduate class removal.

[11] Plaintiff filed two documents in response to Defendants' reply memoranda.  Sur-replies may not be filed as a matter of right.  See Local Rule 230.  However, under the circumstances of this case, the Court will consider Plaintiff's sur-reply, which are documents 44 and 45 in the docket.

[12] This is incorrect.  Plaintiff's second exhibit shows that the last student interview occurred on March 20, 2008 – student "3."  See Plaintiff's Opposition Ex. 2.

his graduate class because, as Beare informed him, four white women refused to be in Parks's class.  Parks also appears to argue that Defendants did not use the standard procedure in dealing with student complaints, but instead suspended him.  Finally, as part of his declaration, Parks states that he was investigated in February 2008 for making a terroristic threat under California Penal Code § 422.  See Parks Dec. ¶ 10.  However, when Parks was cleared of the charge by Det. Madrigal on February 29, 2009, Defendants did not rescind his suspension.  See id.

*Legal Standard*

a.      Title VII Race Discrimination & FEHA Race and Age Discrimination

Title VII prohibits an employer from discriminating against an employee "because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  A plaintiff may show disparate treatment under Title VII through the burden shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  See Hawn v. Executive Jet Mgmt., 615 F.3d 1151, 1155 (9th Cir. 2010); Davis v. Team Elec. Co., 520 F.3d 1080, 1088-89 (9th Cir. 2008); Noyes v. Kelly Servs., 488 F.3d 1163, 1168 (9th Cir. 2007).  Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden to establish a prima facie case of disparate treatment.  Hawn, 615 F.3d at 1155; Noyes, 488 F.3d at 1168.  A plaintiff may establish a prima facie case by showing: (1) that he is a member of a protected class; (2) that he was qualified for his position and performing his jobs satisfactorily; (3) that he experienced adverse employment actions; and (4) that similarly situated individuals outside of his protected class were treated more favorably, or other circumstances surrounding the adverse employment action that give rise to an inference of discrimination.  Hawn, 615 F.3d at 1156; Petersen v. Hewlett Packard Co., 358 F.3d 599, 604 (9th Cir. 2004).  If the plaintiff establishes a prima facie case, the "burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action."  Hawn, 615 F.3d at 1155; Noyes, 488 F.3d at 1168.  If the defendant meets its burden of production, the burden then shifts back to the plaintiff to raise a triable issue of fact that the defendant's proffered reason was a pretext for unlawful discrimination.  Hawn, 615 F.3d at 1155; Noyes, 488 F.3d at 1168.  To show pretext, a plaintiff can produce "either direct evidence, such as clearly sexist, racist, or

similarly discriminatory statements or actions by the employer, or circumstantial evidence supporting an inference of retaliatory or discriminatory motive, so long as such evidence is 'specific and substantial.'" Munoz v. Mabus, 630 F.3d 856, 865 (9th Cir. 2010); see Davis, 520 F.3d at 1089.

Under FEHA, it is an unlawful employment practice for an employer, because of *inter alia* a person's race or age "to discriminate against the person in compensation or in terms, conditions, or privileges of employment." Cal. Gov. Code § 12940(a). "California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination, including age discrimination." Guz v. Bechtel National, Inc. 24 Cal.4th 317, 354 (2000). In other words, "California courts apply the Title VII framework to claims brought under FEHA." Metoyer v. Chassman, 504 F.3d 919, 941 (9th Cir. 2007).

c.      FEHA – Retaliation

Government Code § 12940(h) prohibits retaliation against a person by an employer because "the person has opposed any practices forbidden under [FEHA] or because the person has filed a complaint, testified, or assisted in any proceeding under [FEHA]." Cal. Gov. Code § 12940(h); Jones v. Department of Corrections & Rehabilitation, 152 Cal.App.4th 1367, 1380 n.4 (2007). To establish retaliation, the plaintiff must make a prima facie showing that:  (1) he engaged in a protected activity, (2) the employer subjected him to an adverse employment action, and (3) there was a causal link between the two. Yanowitz v. L'Oreal USA, Inc., 36 Cal.4th 1028, 1042 (2005); Scotch v. Art Institute of Cal., 173 Cal.App.4th 986, 1020 (2009); Jones, 152 Cal.App.4th at 1380. Once the prima facie case is established, the burden shifts to the defendant to show a legitimate, nondiscriminatory reason for the adverse action. Yanowitz, 36 Cal.4th at 1042; Scotch, 173 Cal.App.4th at 1020; Jones, 152 Cal.App.4th at 1380. Upon making such a showing, the presumption of retaliation is dropped and the burden shifts back to the plaintiff to establish intentional retaliation. Yanowitz, 36 Cal.4th at 1042; Scotch, 173 Cal.App.4th at 1021; Jones, 152 Cal.App.4th at 1380.

*Discussion*

Summary judgment in favor of the Trustees is appropriate.

13

With respect to the supervision of student teachers, the declaration from Marshall indicates that he was responsible for assigning supervisory duties to professors.  The declaration states that Marshall assigned these duties to both African-American professors, as well as non-African-American professors.  See Marshall Dec. ¶ 2.  Marshall declared that he made these assignments to most efficiently utilize the resources available for the benefit of the students, and did so without regard to age or race.  See id.  Parks has declared that he has been required to supervise between 16 and 24 student teachers.  See Parks Dec. ¶ 4.  However, Parks has presented no evidence regarding how many student teachers that the non-African-American professors supervise.  That is, there is no evidence that non-African-American professors are treated more favorably with regard to the number of students teacher assignments.  Further, Parks has presented no evidence that the student teacher assignments do not reflect a legitimate attempt to efficiently utilize resources for the students' benefit.  Given Marshall's uncontradicted declaration, Parks has presented no evidence that the student teacher assignments were based on age or race discrimination, or done for retaliation.

With respect to being removed and suspended from class, being investigated, and receiving a reprimand in July 2008, the Trustees have produced non-discriminatory reasons for these actions.  All of the conduct from the Fall of 2007 to July 2008 is based on complaints received from students.  Specifically, beginning in Fall 2007, students complained that Parks made derogatory and offensive comments regarding race and religion/marital status, made retaliatory comments in class about students who had complained, and made comments that appeared to be designed to discourage students from making complaints against him.  See DUMF 10; Defendants' Ex. J.  Parks was removed from his graduate class in 2007 on the basis of complaints made by students, including complaints regarding religion/marital status.  See Parks Depo. 54:4-57:9; Defendants' Ex. E at 15 & Appendixes C, E.  Parks's 2008 suspension was necessary in order to investigate the complaints and to prevent possible retaliation, and was consistent with the Collective Bargaining Agreement.  See DUMF's 5, 6, 7.  Parks' comments were determined to be a violation of CSUF policy.  See Defendants' Exs. J, K.  The letter of reprimand was based on the finding that Parks's comments had violated CSUF policy, and the

reprimand was pursuant to the Collective Bargaining Agreement.  See DUMF 11.  These are non-discriminatory reasons.

In order to show pretext, Parks argues that the findings are not worthy of credence.  Parks cites very little evidence in support of his assertions.  In his sur-reply, Parks cites to two letters written by a particular student and eight supportive e-mails that were sent to the investigators. Parks contends that the two letters from the one student are untrustworthy because the second letter adds additional inflaming allegations.  Parks contends that the eight supportive student e-mails contradict the complainants.  However, the cited evidence does not discredit the investigation.  Even if the two complaining letters by the one particular student are disregarded, other students confirmed that Parks made statements that were retaliatory, race based, religion/martial status based, hostile, and that discouraged students from making complaints against him.  That is, there were still many students who confirmed that Parks made inappropriate comments.  This is also the problem from which the eight e-mails in support of Parks suffer.  For the most part, the e-mails are general letters of support.  One letter does indicate that the writer never heard Parks say anything against Mexican-Americans.  Another letter, not cited by Parks but mentioned in the report, indicates that he had never heard Parks make sexist or racist comments.  See Defendants' Ex. E at Appx. B.  Several other letters state that Parks is not a racist.  Other letters indicate that they believe that Parks's suspension was due to his prohibiting a student from performing an assignment in Spanish.  However, none of the e-mails specifically discuss the alleged comments by Parks concerning "whites"/"white students," or the comments regarding religion/marriage, or the retaliatory conduct of Parks, or the comments discouraging students from reporting him.  Cf. Sur-Reply Ex. 4 with DUMF 10.  The eight e-mails simply do not address the vast majority of the comments that were allegedly made by Parks.  In fact, while Parks has indicated that he did not make some of the comments and that some of the comments were taken out of context, he does not identify which comments he did not say or which comments were taken out of context.  Further, Parks does not deny reading an e-mail to his class that made complaints against him and that contained information that identified the complainant.

Parks also indicates that other students were not contacted in conjunction with the investigation.  However, 28 students participated in the investigation, including 12 that were supportive of Parks.  It does not appear, as discussed above, that those who were supportive of Parks were able to address the many specific comments that were identified in the complaints and in the report.  Parks has presented no evidence from any of the students whom he contends should have been contacted.  That more students could have been contacted does not make the investigation a sham.

With respect to the length of the suspension, Parks does not dispute that the initial 30 day suspension was in conformity with the Collective Bargaining Agreement, see DUMF 6, nor does Parks dispute that he actually agreed to an additional 30 days in order to complete the investigation.  See DUMF 7.  While Parks contends that the investigation might have been performed more quickly, there is no evidence that the investigation was intentionally delayed to prolong the suspension.  In the course of the investigation, a total of 24 individuals (including Parks) were interviewed, students were interviewed from March 4 to March 20, 2008, other faculty were interviewed from April 4 to April 18, 2008, seven e-mails/letters were received, and many allegations and comments were involved.  See Defendants' Ex. J; Sur-Reply Ex. 2.  This appears to be substantial activity, especially considering the effort of coordinating schedules with 24 witness.

Parks also declares that, despite being cleared of allegations that he had made a terroristic threat in violation of the California Penal Code, his suspension was not revoked.  See Parks Dec. ¶ 11.  However, the terroristic threat was not the sole basis for Parks's suspension.  Parks's suspension was done in order to investigate additional comments made by him and in order to prevent retaliation.  While Detective Madrigal may have cleared Parks of criminal wrong doing, other inappropriate comments that Parks allegedly made were still under investigation.  Since the investigation into the many other comments by Parks were still under investigation, there appears to be no reason to have lifted the suspension.

With respect to removal from the graduate course in 2007, Parks has presented no evidence in defense of this claim, either in opposition or in his sur-reply.  Parks has created no

1    dispute that he was removed from the class based on student complaints.

2        Finally, with respect to the letter of reprimand in May 2009, the Trustees have proffered a

3    non-discriminatory reason for this letter.  The Trustees contend that they received complaints

4    from local public school administrators that Parks was not properly supervising the student

5    teachers.  An investigation into this allegation confirmed that Parks was not properly performing

6    his duties.  This is a non-discriminatory reason for the reprimand letter.

7        To show pre-text, Parks argues that complaints against him by the school administrators

8    were solicited by Redd-Williams, Beare, and Parten.  Parks cites Exhibits 4 and 5 of his

9    opposition.  However, those documents are not addressed to Redd-Williams, Beare, and Parten,

10   rather one is addressed to Marshall and the other is not specifically addressed to anyone.  See

11   Opposition Exs. 4, 5.  Parks has presented no evidence that contradicts the assertion that CSUF

12   received complaints against him from local school administrators.  See DUMF 14.  In fact,

13   Plaintiff's Exhibit 5 begins by thanking Marshall for agreeing to remove Parks from supervising

14   the student teachers at the particular elementary school.  See Plaintiff's Ex. 5.  Further, Parks

15   presented no evidence that the complaints made by the local elementary school administrators

16   were false and that the Trustees knew that the complaints were false.

17       Parks has failed to show that the reasons proffered by the Trustees were pretext.  Except

18   for supervising student teachers, the reasons or bases for each of the acts Parks complains about

19   are the complaints by students or elementary school administrators.  Parks has not shown that the

20   complaints were obviously false or that the investigations were biased against him because of his

21   race or age.  Further, Marshall's uncontradicted declaration indicates that the student teaching

22   assignments were made without regard to race, and were made to maximize the benefits of the

23   students.  See Marshall Dec. ¶ 2.  Beare, Parten, Welty, Redd-Williams, and Marshall, who were

24   responsible for each of the acts complained of, all declared that they did not discriminate against

25   Parks on the basis of age or race, nor did they retaliate against Parks for filing complaints with

26   the DFEH and EEOC.  See DUMF 20; Beare Dec. ¶11; Parten Dec. ¶ 9; Welty ¶ 7; Redd-

27   Williams Dec. ¶ 5; Marshall Dec. ¶ 5.  Parks has presented no evidence to the contrary.

28       Although Parks states that he has evidence from which a jury could find unlawful

discrimination, once the Trustees filed their properly supported Rule 56 motion, the rules of civil procedure required Parks, before reaching a jury, to first present evidence that rises to the level of creating a genuine disputed material fact to the Court.  See Fed. R. Civ. Pro. 56; Matsushita Elec., 475 U.S. at 586; Nissan Fire, 210 F.3d at 1103.  Stating that evidence will be presented to the jury is insufficient.  See Galen, 477 F.3d at 658; Agosto, 299 F.3d at 23; Bryant, 289 F.3d at 1167; cf. Exeter, 58 F.3d at 1312 n.5; Angel, 653 F.2d at 1299; British Airways, 585 F.2d at 951-52.  Parks has not presented sufficient evidence to show pretext or discrimination by the Trustees.  Because there is insufficient evidence that the Trustees acted with the intent to retaliate or the intent to discriminate on the basis of age or race, summary judgment in favor of the Trustees on the first four causes of action is appropriate.

II.    Fifth Cause of Action[13]

*Defendants' Arguments*

Defendants argue that they are entitled to summary judgment for two reasons.  First Parks's FEHA harassment claim is based on conduct that consists of common and necessary personnel management actions, which can not support a claim as a matter of law.  Harassment is distinct from discrimination and focuses on the social environment of the work place. Harassment is not conduct of a type that is necessary for managing a business or supervising employees.  Parks indicates that harassment occurred because he was assigned to supervise student teachers, his classes were reduced, he was removed from a class, complaints against him were solicited and investigated, and he received letters of reprimand.  However, these actions all fall within the scope of the Defendants' respective job duties.  Second, the same non-discriminatory reasons previously proffered by the Trustees for the conduct at issue apply equally to the individual Defendants.  That is, there were legitimate, non-discriminatory reasons for the conduct at issue.

*Plaintiff's Opposition*

Parks does not specifically address this cause of action in his opposition.  However, Parks

---

[13]The fifth cause of action is alleged against all defendants.

does declare that, in his 13 year tenure at CSUF, there has always been racial tension between "the Faculty of Color and our White colleagues."  Parks Dec. ¶ 6.  Parks also submitted two letters written by the "University Faculty of Color for Academic, Gender, and Social Justice."  See Plaintiff's Exs. 7, 8.  One letter discusses in part a perceived hostile work environment.  See id. at Ex. 7.  Parks states that he has an abundance of evidence from which a jury could find a hostile work environment.

### *Legal Standard*

Under FEHA, it is unlawful for an employer or any other person because *inter alia* race "to harass an employee . . . ."  Cal. Gov. Code § 12940(j)(1).  "Discrimination claims" and "harassment claims" are distinct under FEHA.  Miller v. Department of Corrections, 36 Cal.4th 446, 461 n.5 (2005); Reno v. Baird, 18 Cal.4th 640, 645-46 (1998); Janken v. GM Hughes Electronics, 46 Cal.App.4th 55, 63 (1996).  "[H]arassment focuses on situations in which the social environment of the workplace becomes intolerable because the harassment (whether verbal, physical, or visual) communicates an offensive message to the harassed employee."  Roby v. McKesson Corp., 47 Cal.4th 686, 706 (2009).  "Harassment is not conduct of a type necessary for management of the employer's business or performance of the supervisory employee's job."  Reno, 18 Cal.4th at 646; Thompson v. City of Monrovia, 186 Cal.App.4th 860, 879 (2010); Janken, 46 Cal.App.4th at 63.  Therefore, "commonly necessary personnel management actions such as hiring and firing, job or project assignments, office or work station assignments, promotion or demotion, performance evaluations, the provision of support, the assignment or non-assignment of supervisory functions, deciding who will and who will not attend meetings, deciding who will be laid off, and the like, do not come within the meaning of harassment."  Reno, 18 Cal.4th at 646-47; Janken, 46 Cal.App.4th at 63.

### *Discussion*

Parks does not address the substance of the Defendants' arguments.  While Parks states that he has abundant evidence that can convince a jury that harassment occurred, as explained above, such an argument is inadequate in the context of summary judgment.  See Galen, 477

19

1  F.3d at 658; Agosto, 299 F.3d at 23; Bryant, 289 F.3d at 1167.  Parks has presented a letter dated

2  September 9, 2009, that purports to address race issues and work environment.  However, the

3  letter is unsigned, as well as being unsworn.  Further, the letter does not discuss any of the

4  specific acts at issue in this case.  See Sur Reply Ex. 7.  Moreover, the letter as used by Parks is

5  hearsay, and Defendants' objections thereto must be sustained.  See Fed. Rs. Evid. 801(c), 802.

6        There is no admissible evidence that shows that the social environment of the workplace

7  had become intolerable because of racial conduct.  Roby, 47 Cal.4th at 706.  Instead, the

8  evidence focuses on the investigations, suspensions, letters of reprimand, and job assignments

9  that Parks endured.  This is conduct that fits squarely under the category of "personnel

10  management actions" because the conduct relates to the management of CSUF and the

11  supervision of the professors.[14]  See Reno, 18 Cal.4th at 646-47; Janken, 46 Cal.App.4th at 63.

12  Because "personnel management actions" do not constitute harassment under FEHA, summary

13  judgment in favor of Defendants is appropriate.  See Gathenji v. Autozoners, LLC, 703

14  F.Supp.2d 1017, 1033 (E.D. Cal. 2010); Reno, 18 Cal.4th at 646-47; Janken, 46 Cal.App.4th at

15  63.

16        Further, the conduct at issue in the fifth cause of action is the same conduct at issue in the

17  first four causes of action.  For the reasons explained above, there were non-discriminatory

18  reasons for each of the acts at issue.

19

20                                    **CONCLUSION**

21        Defendants have moved for summary judgment on all claims alleged against them.  With

22  respect to the first four causes of action, Defendants have shown that each of the acts about

23

24        [14]Parks declared that in 2000 and apparently 2001, there were disparities between "White Faculty" and
25  "Faculty of Color" with respect to merit pay.  See Parks Dec. ¶ 5.  Specifically, the "White Faculty" received larger
   merit pay bonuses.  See id.  Parks declared that merit pay ended after the second year (apparently 2001) because of
26  the complaints by the "Faculty of Color" and the animosity that was created.  See id.  However, this conduct was not
   identified in the SAC, and it appears that six years elapsed between this conduct and the conduct at issue in this case.
27  There is also no indication that administrative remedies have been exhausted with respect to "merit pay."  See
   Romano v. Rockwell Internat., Inc., 14 Cal.4th 479, 492 (1996).  Moreover, determining how bonuses are
28  distributed and who will receive a merit bonus would appear to be a "personnel management action," which is not
   harassment under FEHA.  See Reno, 18 Cal.4th at 646-47; Janken, 46 Cal.App.4th at 63.  The 2000 and 2001 merit
   pay incidents do not create a genuine issue of fact.

                                        20

which Parks complained, with one exception, were the result of either student complaints or elementary school administrator complaints.  The evidence indicates that the students complained about derogatory comments, racial comments, religious/marital status comments, retaliatory comments, and comments that were intended to prevent the students from complaining.  An investigation substantiated the complaints.  As for the 2009 reprimand, the letter was based on substantiated complaints by elementary school officials that Parks was not properly supervising student teachers.  As for the student assignments, those assignments were made to non-African-American professors and were meant to maximize student benefit.  In this case, all of the individuals responsible for the conduct at issue have declared that they did not retaliate against Parks or discriminate against Parks on the basis of age or race.  Parks has not presented evidence that shows pretext or discriminatory conduct on the basis of age or race.  Summary judgment is appropriate.

With respect to the fifth cause of action for harassment, summary judgment is appropriate because there was a non-discriminatory reason for the conduct at issue and the conduct at issue are all personnel management matters which cannot form the basis of a FEHA harassment claim.  Summary judgment on this claim is appropriate.

Accordingly, IT IS HEREBY ORDERED that:

1.     Defendants' motion for summary judgment is GRANTED; and

2.     The Clerk shall enter judgment in favor of Defendants and against Plaintiff and CLOSE
        this case.

IT IS SO ORDERED.

Dated:   __April 22, 2011__                    _____
                                               CHIEF UNITED STATES DISTRICT JUDGE